UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| INDIAN BRAND FARMS, INC., et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 99-2118 |
| v. | : | |
| NOVARTIS CROP PROTECTION, INC., | : | MEMORANDUM OPINION & ORDER |
| Defendant. | : | |

     Presently before the Court is Defendant's renewed motion for partial summary judgment based on preemption of Plaintiffs' claims by the Federal Insecticide, Fungicide, and Rodenticide Act (hereinafter "FIFRA").[1]  Using an inducement test, on August 21, 2003, the Court granted summary judgment in favor of Defendant holding that Plaintiffs' claims were preempted by FIFRA.  Plaintiff appealed.  In the interim, the United States Supreme Court issued its opinion in Bates v. Dow Agrosciences, L.L.C., 544 U.S. 431 (2005), which rejected use of the inducement test as a means of determining preemption and directed the employment of a two part test.  To determine that a state statutory or common law claim is preempted by FIFRA, (1) the statute or common law rule must create a requirement for labeling or packaging *and* (2) the labeling or packaging requirement must be in addition to or different from those required under FIFRA.  See id. at 444.

---

[1] On review, the Third Circuit affirmed the dismissal of the claims of seven of the thirteen settling farmers based on the releases. In addition, the Court further held that Plaintiff's claims based on theories of strict liability, negligent testing, and breach of express warranty were not preempted by FIFRA and the Court remanded these claims for further proceedings.  As a result, this motion deals only with the preemption of Plaintiffs' claims of failure-to-warn, negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act.

Applying the new standard announced in Bates, on the claims of negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act, the Third Circuit ruled that to the extent that these claims were based on oral representations, they are not preempted. Mortellite v. Novartis, 460 F.3d 483, 491 (3d Cir. 2006). However, to the extent that these claims rely on written materials, the Third Circuit concluded that the claims were preempted if the materials qualify as "labels" or "labeling" under FIFRA. Id. ("We conclude that Plaintiffs' claims of negligent misrepresentation, fraud, and statutory consumer fraud are preempted only to the extent that those claims rely on written misrepresentations that qualify as "labels" or "labeling" as defined by FIFRA.") Given that the parties did not brief the question of whether the written materials were within the FIFRA definition of "labels" or "labeling," the Circuit remanded this issue for further consideration. Finally, as to whether any claim of failure-to-warn was preempted by FIFRA, the Third Circuit held that the first prong of the Bates test was satisfied, but remanded for further consideration the issue of whether the second prong was satisfied. Id.

Thus, in this motion for partial summary judgement based on FIFRA preemption, pursuant to the directive of the Third Circuit, the issues before the Court are: (1) whether the written materials relied upon by Plaintiffs qualify as "labels" or "labeling" under FIFRA; if so, the Third Circuit directs that Plaintiff's claims of negligent misrepresentation, fraud and breach of the New Jersey Consumer Fraud Act are preempted by FIFRA; and (2) whether Plaintiffs' failure-to-warn claim, if successful, would "create requirements in addition to or different from those under FIFRA"; if so, that claim is preempted as well. Id.

**Background[2]**

The Plaintiffs in this matter are South Jersey blueberry farms and farmers. Defendant is a non-New Jersey corporation that, beginning in 1997, formulated, manufactured, and marketed an insecticide known as Diazinon AG600 WBC. During the Spring of 1997, Plaintiffs sprayed their blueberry fields with Diazinon AG600 WBC, either alone or mixed with a fungicide, Captan 80 WP or Captec, neither of which are manufactured by the Defendant. By the end of May, 1997, Plaintiffs began to notice damage to the blueberry plants that had been sprayed with the Diazinon AG600 WBC. Other bushes on Plaintiffs' farms that had been sprayed with other pesticides, either by themselves or mixed with Captan 80 WP and/or Captec, allegedly exhibited no damage. Plaintiffs reported the damage to the Defendant.

As the season progressed and the plants began to produce berries, Plaintiffs discovered damage to the fruit as well. Some Plaintiffs hired William Sciarappa, Ph.D. to perform investigation, testing, and documentation of the damage. From June 1997 to August 1997, representatives of Novartis, including Dr. Neil Lapp, visited the Plaintiffs' farms to investigate their claims and assess the problem. Dr. Lapp testified at deposition that although Novartis' investigation failed to substantiate the farmers' contentions that Diazinon AG600 WBC caused the crop injury, the company determined that it would explore goodwill settlements with the farmers.

---

[2]The facts of the case were set forth in this Court's December 20, 2000 Opinion granting summary judgment for the Defendant against several Plaintiffs and in the Court's August 21, 2003 Order granting Defendant's motion for summary judgment. They are repeated here as set forth in the Fourth Amended Complaint for the convenience of the reader.

3

Plaintiffs allege that in or about mid-July of 1997, Dr. Lapp, who had just become Defendant's Technical Services Manager on July 2, 1997, told Plaintiffs not to hire an attorney, because Novartis would treat them fairly and compensate them for all of their damage, present and future. Allegedly at the direction of Dr. Lapp, during the Fall of 1997, all Plaintiffs except Indian Brand Farms, Inc. and Columbia Fruit Farms, Inc. submitted documentation to Novartis outlining only the damages they had suffered during the crop year. These Plaintiffs allege that Dr. Lapp represented that Novartis would talk to them about further damages to their crops, plants, and land sustained during the crop years 1998 and following, after those particular years were over.

From November of 1997 through January of 1998, Defendant entered into settlement agreements with Plaintiffs Joyce Cappuccio, individually and d/b/a Wm. Cappuccio & Sons, Gregory A. Clark, individually and d/b/a Clark Farms, R & S Franceschini Farms, Anthony Melora, individually and d/b/a Melora Farms, Columbia Cranberry, Inc. and Joseph E. Martinelli, individually and d/b/a Blu-Jay Farms (the "Settling Plaintiffs"). Each of these "settling plaintiffs" signed a Release indicating that he or she received settlement proceeds

> in full satisfaction and extinguishment of all claims and causes of action against [defendant] . . . arising out of any damage or loss, present or future, to crops, plants, animals, fish or land, direct or indirect, known or unknown allegedly sustained by the [settling plaintiff] as a result of the use of [Diazinon AG6OO].

The Release further provided, "It is agreed that this is a business decision in compromise of a disputed claim and that the making of this payment is not an admission of liability on the part of [Defendant]."

The settling Plaintiffs also signed a Confidentiality Agreement, which stated:

4

> The goodwill settlement which has been negotiated between [defendant] and the owner/manager of the crop in question is a business transaction. Each party is required to keep the details of the agreement confidential. If either party violates this Confidentiality Agreement, both agree that this goodwill settlement may be null and void.

In the Spring of 1998, it became apparent that there was continuing damage to all of the plants that had been sprayed with the Diazinon AG600 WBC the previous year. At about the same time, Indian Brand Farms, Inc. and Columbia Fruit Farms, Inc. Submitted their crop loss and damage report for 1997 & 1998, but Novartis denied these Plaintiffs any compensation for 1997 or 1998 damage. Some of the settling plaintiffs again contacted Novartis about the damages, but Dr. Lapp told them that the company had closed its files on the matter and had no intention of considering further damage caused by Diazinon AG600 WBC.

Thus, the essence of the dispute in this case centers around damage allegedly caused to Plaintiffs' blueberry plants and crops by a chemical manufactured by Defendant. Defendant asserted that the majority of Plaintiffs signed a Release concurrent with taking certain sums in settlement of this claim after evaluating initial damage to the 1997 crops, with the Releases giving up all rights to future damages. However, the "Settling Plaintiffs" sought to avoid the Releases by asserting that Defendant fraudulently induced them into signing.

The Fourth Amended Complaint, filed in April of 2007, contains seven counts. Count I has alleged Strict Products Liability in that Diazinon AG600 WBC had a latent defect which made it unreasonably dangerous to Plaintiffs' plants and land, and which resulted in injury to Plaintiffs' plants and land.

Count II states a claim for Negligence in that the defendant negligently placed

5

Diazinon AG600 WBC into the stream of commerce, and was negligent in formulating, testing, manufacturing, instructing, and distributing Diazinon AG600 WBC.

Count III alleges Fraud in that the Defendant told the Settling Plaintiffs that any settlement reached for damages was for the crop year 1997 only, but Defendant knew that this was a misrepresentation and that it was fraudulently inducing those Plaintiffs to sign the Releases.  Plaintiffs allege that they relied on Defendant's representations and signed releases, and that such reliance was detrimental as there was future damage.

Count IV alleges Negligent Misrepresentation/Fraud by stating that the Defendant marketed its product as effectively controlling certain insects without inflicting adverse effects on plants or soil and the defendant knew or should have known that this was a false statement regarding a material fact.  Plaintiffs allege they relied to their detriment on the written material concerning Diazinon AG600 WBC and suffered damages.

Count V alleges Breach of Covenant of Good Faith and Fair Dealing in that the Settling Plaintiffs believed, from representations of the defendant, that the Release agreements pertained to damages for the 1997 crop year only.  Plaintiffs allege that they were told that subsequent damages to their plants and land would be discussed during subsequent crop years; however, it allegedly is now apparent that the Defendant had no intention of compensating Plaintiffs for further damages.

Count VI alleges Breach of Express Warranty in that the Defendant warranted that its product would conform to the chemical description on its label and was reasonably fit for the purposes stated on its label when used in accordance with it and Defendant further warranted that its product would act as an insecticide and would not

injure plants and land.  Plaintiffs further allege that Defendant's disclaimer is ineffective as a limitation of liability due to direct contact and representations made by Defendant to Plaintiffs.

Count VII alleges Breach of the New Jersey Consumer Fraud Act by Defendant's deceptive representation that its product was safe to use on blueberry plants as an insecticide.

On December 20, 2000, this Court granted in part and denied in part Defendant's motion for summary judgment on the Release issue.  Because alleged misrepresentations made by the Defendant to Plaintiffs Joyce Cappuccio, Anthony Melora, Gene Martinelli, and Joseph Martinelli could have been seen as pertaining to the "purport or contents" of the Releases and they may have induced these Plaintiffs to sign the Releases, the Court refused to give effect to their Releases in order to dismiss the claims of these Plaintiffs.  Thus, Defendant's motion for summary judgment was denied as to the claims of those four Plaintiffs.  Additionally, finding the Defendant's lack of explanation that the Release cut off future damages after the Defendant allegedly told some Plaintiffs that seeking counsel of anyone, including an attorney, would lead to a withdrawal of the settlement offer, may have constituted "basic unfairness in the circumstances attending the execution of the Release" for each of those Plaintiffs, the Court also denied summary judgment as to the claims of Plaintiffs Clark and Franceschini.  The Court gave effect to the rest of the Releases and dismissed the remaining Settling Plaintiffs' claims as the Releases covered "all claims and causes of action" for "any damage or loss, present or future."

On July 26, 2001, the Court clarified that it granted Defendant's motion for

7

summary judgment on Plaintiffs' claims insofar as they sought rescission of the Releases they signed with Novartis because the Plaintiffs had not returned the consideration they received. The Court denied the motion for summary judgment on Plaintiffs' reformation claims, however, because it is possible for the Plaintiffs to show a unilateral mistake on their part along with fraud on the part of the Defendant. The Court also determined that the Plaintiffs would be limited to equitable remedies on the Releases they signed with Novartis, and would be precluded from pursuing claims for legal damages for breach of contract or legal fraud.

The remaining non-settling Plaintiffs are Indian Brand Farms, Inc. and Columbia Fruit Farms, Inc. The remaining "settling plaintiffs" are Joyce Cappuccio, Gregory Clark, Russell Franeschini, Columbia Cranberry, Joseph Martinelli, and Anthony Melora.

## Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Id. Consequently, a district court

may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

      The basic framework of summary judgment places the initial burden of demonstrating the absence of a genuine issue of material fact upon the moving party. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## Analysis

      The issues presented in this motion have been framed by the Third Circuit in Mortellite, 460 F.3d 483. Applying Bates, the Circuit identified several discrete issues for consideration on remand. In so doing, the Circuit explicitly directed the application of Bates and consideration of these claims under the auspices of FIFRA. Id. For this

reason, Plaintiffs' contentions that Bates and FIFRA are inapplicable to this case are futile and will not be addressed in this Opinion.

### I. Plaintiffs' Claims of Negligent Misrepresentation, Fraud, and Breach of the New Jersey Consumer Fraud Act

The Third Circuit directs dismissal of Plaintiffs' claims of negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act contained in Counts IV and VII if the written materials relied upon by Plaintiffs fall within the definition of "labels" or "labeling" under FIFRA.  See Mortellite, 460 F.3d at 491.  Under, FIFRA a "label" is "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers." 7 U.S.C. § 136(p)(1). "Labeling" is defined as:

> all labels and all other written, printed, or graphic matter, (A) accompanying the pesticide or device at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

7 U.S.C. § 136(p)(2).

The written representations in this case are found on the product label itself and allegedly in a brochure.  Obviously, the product label itself falls under the FIFRA definition, but Plaintiff now contends that the relevant misrepresentations were contained in the Novartis brochure.  Neither party has cited any authority relating to the

10

brochure's potential inclusion in the FIFRA definition of "labeling."[3]  It is undisputed that the brochure in question was not issued to Plaintiffs concomitant with the product.  Thus, Plaintiffs contend that because the brochure did not literally "accompany" the product, by definition it does not qualify as "labeling."  Plaintiffs' interpretation of "accompany" necessitates spatial and temporal proximity of the brochure to the product itself.

This Court is aware of only one decision where the construction of the term "accompanying" in FIFRA's definition of "labeling" was considered.  In The New York State Pesticide Coalition, Inc. v. Jorling, the Second Circuit considered whether New York's pesticide notification provisions constituted "labeling" and were, therefore, preempted by FIFRA.  874 F.2d 115 (2d Cir. 1989).  The New York notification regulations at issue required commercial pesticide administrators to enter into a contract with the owner of a premises, provide the owner with a list of the chemicals used in the application concomitant with all of the warnings that appear on the EPA approved label, provide the owner with a cover sheet, and post signs on the property notifying the public that the premises was being treated.  Id. at 116.  Appellants argued that because the "notification materials [were] present in some spatial and temporal proximity to the applied pesticide," they accompanied the pesticide and constituted "labeling" under FIFRA.  Id. at 119.  The court rejected that construction of

---

[3] Without citing any authority, Plaintiffs contend that because the brochure did not accompany the product when the product was delivered, it by definition does not qualify as "labeling."  Defendant asserts that because Plaintiffs cannot prove that they relied on the brochure, it is not necessary to consider whether the brochure qualifies as "labeling."  Defendant's argument goes to the merits of summary judgment, but does not address the preemption issue.

"accompany," stating that is was "strained" and lead to a "bizarre result." Id.

In reaching the conclusion that a literal application of the term accompany was not warranted, the court explained that "FIFRA 'labeling' is designed to be read and followed by the end user." Id. The court was persuaded by the fact that the notification materials were aimed at the general public and not intended for the users of the product. The court, however, acknowledged that "accompanying" is "[g]enerally . . . conceived as being attached to the immediate container of the product in such a way that it can be expected to remain affixed during the period of use." Id. Nonetheless, the court concluded that the notification materials did not constitute 'labeling' simply because they accompanied the pesticide product. Id.

Although the circumstances in Jorling are somewhat antithetical to the case at bar (namely whether materials near the product could be considered labeling rather than, here, whether materials issued separately from the product qualify as labeling), the court's analysis and reasoning is applicable in this case. This Court agrees with the conclusion of the Second Circuit that the term "accompany" contained in the definition of "labeling" in FIFRA does not command spatial or temporal proximity to the product.

Indeed, several courts, including the Supreme Court, have considered marketing materials and brochures that were not necessarily a companion of the product as labeling under FIFRA. While the issue in those cases did not directly turn on the proximity of the materials to the product, the fact that those courts considered the materials under FIFRA is persuasive.

In Kordel v. United States, 335 U.S. 345, 348 (1948), cited in Jorling, the Supreme Court considered literature provided by a drug manufacturer as labeling even

12

though the materials "w[ere] displayed in stores in which the petitioner's products were on sale" and that "[s]ome of [the materials were] given away with the sale of products; some sold independently of the drugs; and some mailed to customers by the vendors." Id. Concluding that the materials were labeling, the Court reasoned that "the drugs and the literature had a common origin and a common destination. The literature was used in the sale of the drugs. It explained their uses. . . . Thus the products and the literature were interdependent . . . ." Id. Likewise, in Mortellite v. Novartis, 278 F. Supp. 2d 390, 401 (D.N.J. 2003), this Court explained that:

> Because the representations in the brochure are consistent with the label, that the product was safe for use on blueberries, preemption still results. See Kuiper v. American Cyanamid Co., 131 F.3d 656, 662-63 (7th Cir. 1997)[4] (off-label statements about product safety which merely reiterate information/restrictions found on label itself are preempted).  When advertising or promotional materials merely repeat information or language contained on the label, claims directed at the advertising necessarily challenge the label itself and are therefore preempted. Id. (citing Lowe, 47 F.3d at 130; Worm, 5 F.3d at 748). Some circuits have held that FIFRA preempts even State law claims against advertisements that "substantially differ" from the label. See Taylor, 54 F.3d at 561 (quoting Papas, 985 F.2d at 519) ("any claims that point-of-sale signs, consumer notices, or other informational materials failed to adequately warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging."). "Because claims challenging the adequacy of warnings or materials other than the label or package of a product necessarily imply that the labeling and packaging fail to warn the user, we conclude that these claims are also preempted by FIFRA." Papas, 985 F.2d at 519.

The Court finds that the brochure qualifies as labeling as defined by FIFRA and the fact that it did not necessarily accompany the product in a literal sense does not undermine this finding.  In so ruling, the Court agrees with and adopts the Second Circuit's construction of the term "accompanying" and finds support for this conclusion in the above referenced decisions.  Since the Court has determined that the brochure

---

[4]The Court notes that the decision in Kuiper v. American Cyanamid Co., 131 F.3d 656, 662-63 (7th Cir. 1997) was reversed on other grounds.

13

qualifies as 'labeling' under FIFRA, the Third Circuit directs that insofar as they are based on the written representations in the Novartis brochure, Plaintiffs' claims of negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act contained in Counts IV and VII are pre-empted by FIFRA. Mortellite, 460 F.3d at 491.[5]

To the extent that Plaintiffs' claims of negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act contained in Counts IV and VII are based on oral representations of Novartis, they are not preempted. However, Plaintiffs have not identified with any certainty any oral representations made by Novartis that they relied on. At best, Plaintiffs assert that Novartis representatives "may have" made an oral representation "because Dr. Pavlis in his deposition, testified that a Novartis representative who was present at the May Meeting with the farmers provided the brochures for farmers' use and addressed the farmers for a few minutes, talking of Diazinon being safe for the crops." (Plaintiffs' Opposition at p. 16.) Giving Plaintiffs all favorable inferences at this stage, there is no evidence that any oral representations were made by Novartis regarding the use of Diazinon AG600 and/or relied upon by Plaintiffs. As a result, insofar as they are based on oral representations of Novartis, summary judgment is granted as to Plaintiffs' claims of negligent misrepresentation, fraud, and breach of the New Jersey Consumer Fraud Act contained in Counts IV and VII.

## II. Failure-to-warn claim

---

[5]Having determined that these claims are preempted, the Court need not decide whether Plaintiffs relied upon the brochure before purchasing and applying the product in 1997. The Court notes, however, that the record reflects Plaintiffs never received and/or relied upon any written representations outside of the product label before purchasing and using Diazinon AG600. (Def. Stmt. Undisputed Material Facts, Tab B ¶ 3; Tab C ¶¶4-5; Tab D¶5; Tab E¶8; Tab F¶¶6, 9; Tab G¶¶3-4; Tab H ¶¶3-4; Tab I¶¶3-4).

Essentially, Plaintiffs' failure-to-warn claim seeks to impose liability for failing to warn against tank-mixing with Captan/Captec and/or failing to warn about the presence of an inert ingredient/surfactant in Diazinon AG600. Plaintiffs argue that their failure-to-warn claims are not directed at the label, but at the brochure. Given that Plaintiffs' contentions are premised upon the failure to warn of the dangers of tank-mixing Diazinon AG 600 with Captan/Captec, these claims would necessitate a warning in addition to or different from those required by FIFRA and are preempted by that statute.

In an attempt to save this claim, Plaintiffs attack the information on the brochure, arguing that it is not part of the label and therefore subject to the New Jersey Consumer Fraud Act. As previously stated, however, the Court has determined that the brochure qualifies as labeling.

Plaintiffs next contend that FIFRA is inapplicable to any failure to warn claim because FIFRA does not apply to crop damage claims, as the EPA waived efficacy jurisdiction and that failure to warn claims for crop damage are not preemptable because there is no efficacy review inherent in FIFRA's labeling registration process. (See Plaintiffs' Opposition at p. 9.) The Third Circuit concluded, however, that Plaintiffs' failure to warn claim creates a requirement for labeling, satisfying the first prong of Bates, and directed this Court to consider whether success on any such claim would "create requirements in addition to or different from those under FIFRA." Mortellite, 460 F.3d at 491. This directive implies that Plaintiffs' failure to warn claim is subject to FIFRA preemption.

Thus, the Court's task with respect to this claim is to determine whether this

15

count implicates the second prong of Bates.  The EPA has stated "in cases where the pesticide labels are silent on the matter of tank mixing, applicators [are] permitted to use tank mixes *at their own risk*."  Revised Policy on Label Claims for Tank Mixing, Pesticide Regulation (PR) Notice 82-01 (Jan. 12, 1982) (emphasis added).  In addition, the EPA does not require registrants to identify individual inert ingredients, such as surfactants, that are not highly toxic on the product label.  See 7 U.S.C. § 136h(d)(1)(C); 40 C.F.R. § 156.10(g)(1) & (7).  Indeed, inert ingredients are considered confidential under FIFRA.  Northwest Coalition for Alternatives to Pesticides v. Browner, 941 F. Supp. 197, 199-201 (D.D.C. 1996).

"If the federal government's labeling requirements are limited to pesticide characteristics A, B, and C, and a state imposes a labeling requirement related to pesticide characteristic D, the conclusion that the state requirement is both "in addition to" and "different from" the federal requirements seems inescapable."  Dahlman Farms, Inc. v. FMC Corp., 240 F. Supp. 2d 1012, 1018 (D. Minn. 2002).

Here, the reasonably foreseeable use of tank mixing is not required to be addressed.  Any of Plaintiffs' claims premised upon a failure to warn of the dangers of tank-mixing Diazinon AG 600 with Captan/Captec would necessitate a warning in addition to or different from those required by FIFRA and therefore are preempted by that statute.

Plaintiffs allege that "New Jersey's Product Liability Act places a duty to warn if a product is not reasonably fit for its intended or foreseeable purpose so that it does not put products into the stream of commerce unless they are reasonably safe for use." (See Plaintiffs' Opposition at p. 27-28.)  As such, Plaintiffs contend that the requirements and

intentions of this Act parallel those promulgated by FIFRA; thus, Plaintiffs' failure-to-warn claim gives rise to complimentary, rather than conflicting, requirements. The Court disagrees.

Nonetheless, Plaintiffs contend that tank-mixing was a foreseeable use under N.J. Stat. Ann. § 2A:58C-(b) and (c), and their claims are therefore more aptly characterized as failure-to-warn and defective design. Plaintiffs' reliance on Lewis v. American Cyanamid Co, 155 N.J. 544 (1998) does not support the conclusion that the failure-to-warn claims are not preempted. To the contrary, the court in Lewis, expressly held that plaintiff's failure to warn claims were preempted by FIFRA. Id. at 558. It was only a claim for defective design that was permitted to go forward under the state statute. Id.

Success on the failure-to-warn claims would impose a labeling requirement in addition to the requirements set forth in FIFRA. As a result, the Court finds that the second prong of Bates is satisfied, directing preemption of any claim of failure-to-warn found in Count I or Count II. Summary judgment is granted as to this claim.

### III.  Claims that are not pre-empted by FIFRA: Strict Liability. Negligent Testing, and Breach of Express Warranty

Finally, as stated above, the Third Circuit has instructed that Plaintiff's claims of strict liability, negligent testing, and breach of express warranty are not preempted by FIFRA. The New Jersey Product Liability Act provides that:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2.  Further, claims for common law negligence are subsumed within the statutory cause of action, and are not viable separately for harm caused by a defective product.  Tirrell v. Navistar Intern., Inc., 591 A.2d 643, 647 (N.J. Super. Ct. App. Div. 1991).

The Court previously characterized Plaintiffs' products liability claim as one for failure to warn, as there appeared to be no real claim that the product is defective in manufacture or design.[6]  As stated above, however, any claim for failure to warn is preempted.

Accordingly, if there is a claim remaining for strict liability, it must one for defective design.  Indeed, Plaintiffs have categorized their products liability claim as one for failure to warn and as implicating the provision that the product "was designed in a defective manner."  They argue that it was foreseeable that the product would be mixed with a fungicide and then sprayed on the crops.  But see Port Auth. Of N.Y. v. Arcadian Corp., 189 F.3d 305, 313-14 (3d Cir. 1999) (under New Jersey law, a component product is not defective if it is reasonably safe for its intended or reasonably foreseeable use, even if that product is later used as an ingredient in an unsafe product mix).

It appears that Defendant has made a merit-based attack on Plaintiffs' claims of defective design and negligence, asserting that Plaintiffs have failed to come forward with any credible evidence of product defect or negligence on the part of Novartis.

---

[6]In recharacterizing the claim, the Court noted that the EPA decided that the Defendant does not have to test its product in combinations.  The EPA has stated, "in cases where the pesticide labels are silent on the matter of tank mixing, applicators [are] permitted to use tank mixes *at their own risk*."  Revised Policy on Label Claims for Tank Mixing, Pesticide Regulation (PR) Notice 82-01 (Jan. 12, 1982) (emphasis added).

This Court has previously determined that:

> there is no evidence of design defect when the product is used by itself, without introducing Captan or Captec. Even the expert reports on which Plaintiffs rely in attempt to prove that Diazinon AG600 was inherently dangerous (and that Novartis's failure to test was negligent) qualify their opinions by limiting the danger to situation when the product is mixed with Captan or Captec. (See 9/24/01 Whitcomb report at 3; 9/28/01 Witt Memo.)[7] . . . [T]here is no evidence that the product, unmixed, is inherently dangerous . . . .

Mortellite, 278 F. Supp. 2d at 398-99. Further, the Court has determined, "there is no evidence that placing Diazinon AG600 into the stream of commerce constitutes negligence." Id. at 400. This is the law of the case. See State v. Hale, 317 A.2d 731, 732-33 (N.J. Super. Ct. App. Div. 1974) (applying the law of the case doctrine "to the question of whether or not a decision made by a trial court during one stage of the litigation is binding throughout the course of the action").

Thus, the Court does not see any remaining viable claim for strict liability in this case. Because the Circuit has determined that a claim for strict liability is not preempted, however, the Court will not address design defect in deciding this motion. The Notice of Motion referred only to Plaintiffs' claims of fraud, misrepresentation, and failure to warn, and focused on the preemption issue.[8]

---

[7] Contrary to Plaintiffs' position, the experts need not blame the damage on a label's failure to warn for the Court to characterize a claim as such.

[8] The Court is not comfortable that the strict liability issue was fully briefed by the parties. Rather, it seems to have been raised as an afterthought. Beside the issue not falling under the preemption question, the Court notes that in its Reply brief, Defendant did not address Plaintiffs' arguments that mixing was a foreseeable use, relevant to claims of negligent testing and defective design, and tending to create a jury question.

## Conclusion

For the reasons stated above,

IT IS ORDERED on this 20th day of December, 2007 that the motion of Defendant for partial summary judgment based on FIFRA preemption **[126]** is hereby **GRANTED**.

IT IS FURTHER ORDERED that to the extent that Defendant has separately sought partial summary judgment on the merits of the claims of negligent misrepresentation/fraud and breach of the New Jersey Consumer Fraud Act, that motion **[127]** is **DISMISSED AS MOOT**.

                                                     /s/Joseph H. Rodriguez
                                                JOSEPH H. RODRIGUEZ
                                                       U.S.D.J.