UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

INDIAN BRAND FARMS, et al.,

          Plaintiffs,

     v.


NOVARTIS CROP PROTECTION,
INC.,
          Defendant.

Civil No. 99-2118 (NLH/JS)


**OPINION**


**APPEARANCES:**

Thomas Joseph Vesper, Esquire
Kathleen F. Beers, Esquire
Westmoreland, Vesper & Quattrone, PA
8025 Black Horse Pike
Suite 500
West Atlantic City, New Jersey 08232
     *Attorneys for Plaintiffs Joyce Cappuccio, individually and*
     *d/b/a William Cappuccio & Sons,  Anthony Melora,*
     *individually and d/b/a Melora Farms, and Columbia Cranberry,*
     *Inc. through Gene Martinelli*

Michael D. Martin, Esquire
Martin & Martin
200 Lake Morton Drive
Suite 300
Lakeland, Florida 33801
     *Attorney for Plaintiffs Indian Brand Farms, Inc. and*
     *Columbia Fruit Farms, Inc.*

Carl D. Poplar, Esquire
Carl D. Poplar, P.A.
1010 Kings Highway South
Cherry Hill, New Jersey 08034
     *Attorney for Gregory Clark, individually and d/b/a Clark*
     *Farms, R & S Franeschini Farms, and Joseph Martinelli,*
     *individually and d/b/a Blu-Jay Farms*

Robert J. Machi, Esquire
Morgan Melhuish Abrutyn
651 W. Mt. Pleasant Avenue
Livingston, New Jersey 07031

John P. Mandler, Esquire
Kristin R. Eads, Esquire
Faegre, Baker, Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
     *Attorneys for Defendant Novartis Crop Protection, Inc.*

**HILLMAN, District Judge**

     This matter comes before the Court by way of Defendant
Novartis Crop Protection, Inc.'s ("Novartis") motion [Doc. No.
286] for judgment on the pleadings pursuant to Federal Rule of
Civil Procedure 12(c).  Novartis seeks the dismissal of Counts IV
and VII of Plaintiffs' fourth amended complaint alleging: (1)
common law claims for negligent misrepresentation/fraud; and (2)
statutory claims for violations of the New Jersey Consumer Fraud
Act ("CFA") (collectively referred to as Plaintiffs' "fraud-based
claims").  Plaintiffs oppose Novartis's motion.  The Court has
considered the parties' submissions, and heard oral argument on
the motion.  For the reasons expressed below, Novartis' motion is
granted.

**I.   JURISDICTION**

     In this action, the Court exercises jurisdiction over
Plaintiffs' New Jersey state law claims pursuant to 28 U.S.C. §

2

1332 based on complete diversity of citizenship of the parties and an amount in controversy in excess of $75,000.

## II.  **BACKGROUND**

The detailed factual background of this case has been set forth in several prior opinions issued by the Honorable Joseph H. Rodriguez, U.S.D.J., and the Third Circuit Court of Appeals. Accordingly, the Court sets forth here only the general factual background relevant to the present motion.  Plaintiffs in this action are blueberry farms and individual blueberry farmers located in Hammonton, New Jersey.  Plaintiffs originally filed suit against Novartis, a pesticide company, on May 7, 1999 alleging damage to their blueberry plants and crops sustained after use of a new Novartis insecticide, known as Diazinon AG600 ("AG600"), during the spring and summer of 1997.  For several years prior to the use of AG600 in 1997, Plaintiffs treated their blueberry plants with two other Novartis insecticides – Diazinon 50 WP ("50 WP") and Diazinon AG500 ("AG500").

In order to prevent damage to their blueberry plants from both insects and fungi, Plaintiffs had engaged for some time in the common and allegedly well-known practice of "tank-mixing," a process by which an insecticide, either 50 WP or AG500, would be mixed with a fungicide, either Captan or Captec ("the fungicides") and then applied to their blueberry plants.

3

Plaintiffs had tank-mixed the fungicides with either 50 WP or AG500 for several years and did not experience any crop damage as a result of the application of this mixture.

Subsequently, Novartis introduced and marketed to Plaintiffs a new insecticide — AG600.  Novartis distributed advertising materials which claimed that the new product, AG600, was safer and more effective than either 50 WP or AG500.  In the spring of 1997, Plaintiffs purchased and began using AG600 to treat their blueberry plants.  As Plaintiffs had done in the past with the previous Novartis insecticides – 50 WP and AG500, Plaintiffs tank-mixed AG600 with the fungicides prior to application on their blueberry plants.

At the time of the initial application of AG600 in approximately May of 1997, Plaintiffs were unaware that AG600 contained an additional ingredient known as a surfactant[1] which was not an ingredient in either 50 WP or AG500.  According to Plaintiffs, that surfactant, when mixed with the fungicides, caused systematic injury to their blueberry plants including, but not limited to blotches, depressions, spots on the plants, and plant death.  Plaintiffs contend that Novartis failed to disclose the addition of the surfactant in AG600 to the Novartis field

---

1.  Also known as a "surface active agent."  The surfactant was intended to enhance the ability of the active ingredient in AG600 to spread evenly across plant tissue and adhere to plant structure.

personnel who met with Plaintiffs and that Novartis failed to include this information in any of its advertising or marketing materials promoting the use of AG600.

After several years of motion practice in this District and two separate appeals to the Third Circuit, Plaintiffs' remaining claims at this stage of the case include:[2]

> (1) a strict liability claim by all Plaintiffs under the New Jersey Products Liability Act based on theories of—
>    (a) design defect, and
>    (b) failure to warn of the harm to blueberry plants when AG600 was mixed with a fungicide;
>
> (2) a claim for negligent misrepresentation/fraud by all Plaintiffs except Indian Brand Farms based on Plaintiffs' indirect reliance on Novartis's marketing brochure alleging that Novartis marketed AG600 as controlling insects without having an adverse effect on plants when Novartis knew or should have known that this statement was false;
>
> (3) a claim alleging breach of the New Jersey Consumer Fraud Act by all Plaintiffs except Indian Brand Farms based on Plaintiffs' indirect reliance on the marketing brochure alleging that Novartis deceptively represented that AG600 was safe to use on blueberry plants;
>
> (4) a claim for fraud in the inducement by the six

---

2.  The following claims are no longer part of this action: (1) a claim for breach of express warranty in that Novartis warranted that AG600 would conform to the chemical description on its label and not injure plants; (2) a claim for negligent misrepresentation/fraud based on any oral representations made by Novartis representatives; and (3) a claim alleging breach of the New Jersey Consumer Fraud Act based on oral representations.

Settling Plaintiffs;[3] and

(5) a claim for breach of the covenant of good
faith and fair dealing by the six Settling
Plaintiffs.

## III. <u>DISCUSSION</u>

Novartis filed an answer to Plaintiffs' fourth amended
complaint on April 25, 2007.  (<u>See</u> Answer [Doc. No. 130].)
Accordingly, Novartis now moves for judgment on the pleadings
pursuant to Federal Rule of Civil Procedure 12(c) and seeks the
dismissal of Plaintiffs' common law misrepresentation and

───────────────

3.  The six so-called Settling Plaintiffs include: Joyce
Cappuccio, individually and d/b/a William Cappuccio & Sons,
Gregory Clark, individually and d/b/a Clark Farms, R & S
Franeschini Farms, Columbia Cranberry, Inc. through Gene
Martinelli, Joseph Martinelli, individually and d/b/a Blu-Jay
Farms, and Anthony Melora, individually and d/b/a Melora Farms.
     These Settling Plaintiffs initially entered into "goodwill"
settlement agreements with Novartis between November of
1997 and January of 1998.  The Settling Plaintiffs signed
releases with Novartis indicating that they received the
settlement proceeds "in full satisfaction and extinguishment of
all claims and causes of action against [Novartis] ... arising
out of any damage or loss, present or future, to crops, plants,
animals, fish or land, direct or indirect, known or unknown,
allegedly sustained by the [Settling Plaintiffs] as a result of
the use of AG 600."
     However, in 1998, all Plaintiffs noticed continuing damage to
their blueberry plants based on their use of AG600 in 1997
including stunted plant growth.  When the Settling Plaintiffs
attempted to contact Novartis in 1998 regarding the on-going
damage, Novartis refused to compensate these farmers for any
damages in 1998 asserting that the releases signed by the
settling farmers precluded any future claims.
     The Settling Plaintiffs' claims for fraud in the inducement
and breach of the covenant of good faith and fair dealing with
respect to the releases are not at issue in the present motion.

6

statutory consumer fraud claims as alleged in Counts IV and VII of the fourth amended complaint.  (Mem. in Supp. of Novartis' Rule 12(c) Mot. for J. on the Pleadings as to Pls.' Fraud-Based Claims [Doc. No. 286-1] (hereinafter, "Novartis Mem.") 1.)  Rule 12(c) provides in pertinent part that "[a]fter the pleadings are closed ... a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  "A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion."  Revell v. Port Auth. of N.Y. & N.J., 598 F.3d 128, 134 (3d Cir. 2010) (citing Turbe v. Gov't of the V.I., 938 F.2d 427, 428 (3d Cir. 1991)).

In considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims[.]'"

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions[.]'") (citation omitted).  First, under the Twombly/Iqbal standard, a district court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949).

Second, a district court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Fowler, 578 F.3d at 211 (citing Iqbal, 129 S. Ct. at 1950).  "[A] complaint must do more than allege the plaintiff's entitlement to relief." Fowler, 578 F.3d at 211; see also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element.") (citing Twombly, 550 U.S. at 556).  "The defendant bears the burden of showing that no claim has been

presented." <u>Hedges v. U.S.</u>, 404 F.3d 744, 750 (3d Cir. 2005).

## IV.  <u>ANALYSIS</u>

According to Novartis, Plaintiffs' common law misrepresentation claim and statutory claim under the CFA must be dismissed because under New Jersey law, these two claims are subsumed by the New Jersey Products Liability Act (the "PLA").[4] Novartis argues that "Plaintiffs' core claim underlying each of these theories of liability is that Novartis' Diazinon AG600 product, when tank-mixed with [the fungicides], allegedly caused damage to Plaintiffs' blueberry crops[.]"  (Novartis Mem. 2.) Thus, Novartis asserts that, consistent with state and federal case law interpreting the PLA, Plaintiffs' fraud-based claims must be dismissed because such claims are "subsumed by the NJPLA where the 'core issue' is harm allegedly caused by a defendant's products."  (<u>Id</u>. at 3.)  Novartis contends that the "only claims that are allowed under the NJPLA are [claims for] manufacturing defect, design defect and failure to warn ... and [that] all other claims for relief are subsumed by the NJPLA and subject to

---

4.  As set forth <u>supra</u>, the negligent misrepresentation/fraud claim and the CFA claim remain in this action only with respect to seven of the eight Plaintiffs.  Both of these claims, as asserted by Plaintiff Indian Brand Farms, were previously dismissed in this action by Judge Rodriguez and that dismissal was affirmed on appeal by the Third Circuit. <u>See</u> <u>Indian Brand Farms, Inc. v. Novartis Crop Protection Inc.</u>, 617 F.3d 207, 220-21 (3d Cir. 2010).

dismissal."  (Novartis Mem. 6.)

As a federal court sitting in diversity, the Court must apply state substantive law in this case to determine whether Plaintiffs' fraud-based claims may proceed.  See <u>Liggon-Redding v. Estate of Sugarman</u>, 659 F.3d 258, 262 (3d Cir. 2011) (citing <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78 (1938)).  Accordingly, the Court is bound by decisions of the New Jersey Supreme Court and is guided "by the rulings of the lower New Jersey appellate courts, which may provide 'indicia of how the state's highest court might decide' an issue." <u>Polizzi Meats, Inc. v. Aetna Life & Cas. Co.</u>, 931 F. Supp. 328, 340 (D.N.J. 1996) (citing <u>Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.</u>, 652 F.2d 1165, 1167 (3d Cir.1981)).

### A.    The New Jersey Products Liability Act

The PLA was enacted by the New Jersey Legislature in 1987 "based on an 'urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products.'" <u>Sinclair v. Merck & Co., Inc.</u>, 948 A.2d 587, 593 (N.J. 2008) (citing N.J. Stat. Ann. § 2A:58C-1(a)).  As the New Jersey Supreme Court has explained, by enacting the PLA "'[t]he Legislature intended ... to limit the liability of manufacturers so as to "balance[ ] the interests of the public and the individual with a view towards economic reality."'"  <u>Sinclair</u>, 948 A.2d at 593 (citing <u>Zaza v. Marquess &</u>

10

Nell, Inc., 675 A.2d 620, 627 (N.J. 1996)).  Thus, under New
Jersey law, the PLA governs any "product liability action."

A product liability action is statutorily defined as "any
claim or action brought by a claimant for harm caused by a
product, irrespective of the theory underlying the claim, except
actions for harm caused by breach of an express warranty."  N.J.
Stat. Ann. § 2A:58C-1(b)(3).  The PLA further defines the type of
"harm" caused by a product to include the following: "(a)
physical damage to property, other than to the product itself;
(b) personal physical illness, injury or death; (c) pain and
suffering, mental anguish or emotional harm; and (d) any loss of
consortium or services or other loss deriving from any type of
harm described in subparagraphs (a) through (c) of this
paragraph."  N.J. Stat. Ann. § 2A:58C-1(b)(2).

Between 2007 and 2008, the New Jersey Supreme Court issued
two opinions setting forth substantive guidance regarding the
scope of the PLA.  Specifically, in In Re Lead Paint Litigation,[5]

_____

5.  In Lead Paint, the New Jersey Supreme Court examined whether
the plaintiffs, twenty-six municipalities and counties, stated a
cognizable claim based on the common law tort of public nuisance
seeking to recover the costs of detecting and removing lead paint
from homes and buildings and of providing medical care to
residents affected with lead poisoning.  924 A.2d 484, 486-87
(N.J. 2007).  In affirming the trial court's dismissal of
plaintiffs' public nuisance claims, the Lead Paint court did not
directly address the intersection of the PLA and the CFA where
separate claims were asserted under both Acts.  However, in
concluding that plaintiffs' allegations could not be understood
to state a public nuisance claim under either "traditional [or]
modern concepts of the tort[,]" the Supreme Court expressly noted

the New Jersey Supreme Court explicitly recognized that "'[w]ith
the passage of the Product Liability Act, ... there came to be
one unified, statutorily defined theory of recovery for harm
caused by a product[.]'" 924 A.2d 484, 503 (N.J. 2007) (citation
omitted). The New Jersey Supreme Court went on to observe that
"[t]he language chosen by the Legislature in enacting the PLA
[was] both expansive and inclusive, encompassing virtually all
possible causes of action relating to harms caused by consumer
and other products." Id. (citing N.J. Stat. Ann. § 2A:58C-
1(b)(3) defining a "product liability action"). The New Jersey
Supreme Court further expounded upon the reach of the PLA, and in
particular its relation to the CFA, in Sinclair[6] by acknowledging

---

the "inescapable fact that carefully read, the claims asserted
would instead be cognizable only as products liability claims."
Id. at 503.

6. In Sinclair, the plaintiffs initiated a class action against
Merck & Co., Inc. based on the cardiovascular risks of the
prescription drug Vioxx and sought to recover the costs of
medical monitoring. 948 A.2d 587, 589 (N.J. 2008). The
plaintiffs in Sinclair sued Merck and "various fictitiously-named
distributors, manufacturers, advertisers, sellers, marketing
partners, and promoters" alleging claims for "negligence,
violation of the PLA, violation of the CFA, breach of express and
implied warranties, and unjust enrichment." Id. In affirming
the trial court's dismissal of plaintiffs' PLA claims, the New
Jersey Supreme Court held that "the definition of harm under
[the] Products Liability Act ... does not include the remedy of
medical monitoring when no manifest injury is alleged." Id. at
588-89. The Supreme Court also upheld the dismissal of
plaintiffs' CFA claims concluding that "the PLA is the sole
source of remedy for plaintiffs' defective product claim;
therefore, the Consumer Fraud Act ... does not provide an
alternative remedy." Id. at 589.

that "[t]he language of the PLA represents a clear legislative intent that, despite the broad reach [given] to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product."[7]  948 A.2d at 596.

Relying upon the New Jersey Supreme Court's reasoning in Lead Paint, the Appellate Division of the New Jersey Superior Court addressed the precise issue currently before this Court in McDarby v. Merck & Co., and determined in McDarby that the plaintiffs' asserted cause of action under the CFA was subsumed

---

7.  In Repola v. Morbark Industries, Inc., the Third Circuit was required to predict how the New Jersey Supreme Court would rule on a number of issues arising under the PLA, "the most important of which [was] whether the NJPLA subsumes claims for common law negligence based upon the breach of a duty to provide oral warning[s] undertaken by the distributor of an allegedly defective machine."  934 F.2d 483, 484-85 (3d Cir. 1991).  After careful review and interpretation of the PLA's language, the Third Circuit determined that by bringing "within the statute all claims for damage or injury caused by a product ... 'irrespective of the theory underlying the claim,' [the PLA] effectively creates an exclusive statutory cause of action for claims falling within its purview."  Id. at 492.  Accordingly, the Third Circuit predicted "that the New Jersey Supreme Court would hold that the NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product."  Id.
    The accuracy of the Third Circuit's prediction is reflected by the New Jersey Supreme Court's opinions in Lead Paint and Sinclair decided approximately eighteen years later.  See also Bailey v. Wyeth, Inc., 37 A.3d 549, 583 (N.J. Super. Ct. Law Div. 2008), aff'd, 28 A.3d 1245 (N.J. Super. Ct. App. Div. 2011) (noting that the Third Circuit's prediction in Repola was "accurate" in light of the New Jersey Supreme Court's decision in Sinclair which "supports the conclusion that claims for harm caused by a product are governed by the PLA irrespective of the theory underlying the claim.").

13

by the PLA.  949 A.2d 223, 276-77 (N.J. Super. Ct. App. Div. 2008), cert. granted in part 960 A.2d 393 (N.J. 2008), appeal dismissed as improvidently granted 979 A.2d 766 (2009).  The Appellate Division there ultimately reversed a jury verdict finding that Merck violated the CFA.[8]  Id. at 278-79.  Accordingly, the McDarby court vacated awards for treble damages and attorneys' fees, both made pursuant to the provisions of the CFA, after finding that the plaintiffs' CFA claim asserted "at its core, that Merck failed to warn of dangers from a product of which it had knowledge," which resulted in harm to the plaintiffs.  Id. at 278-79.

The McDarby court recognized that the gravamen of the plaintiffs' consumer fraud claim was that Merck knew of the cardiovascular risks associated with the drug Vioxx but misrepresented and intentionally suppressed, concealed, or omitted material information, and failed to be truthful regarding these risks in marketing the drug.  Id. at 276-77.  Although the McDarby plaintiffs plead this particular claim as one which purportedly fell within the scope of the CFA, upon careful

---

8.  The jury specifically found that "Merck had made misrepresentations that had the capacity to mislead concerning the cardiovascular risk of Vioxx while marketing the drug to prescribing physicians, and that Merck had intentionally suppressed, concealed, or omitted material information about an association between Vioxx and an increased risk of cardiovascular events from prescribing physicians."  McDarby, 949 A.2d at 276 n.49.

review, the Appellate Division determined that the plaintiffs
were "asserting what, in essence, [was] a claim of failure to
warn of [the] dangers inherent in Vioxx cognizable under the
PLA[,]" and not under the CFA.  Id. at 277.

Accordingly, the Appellate Division rejected the McDarby
plaintiffs' attempt to reclassify their PLA claim as a claim also
falling under the CFA simply in order to seek "an additional
damage award for economic loss pursuant to [the CFA] as a result
of the employment by Merck of an 'unconscionable commercial
practice, deception, fraud, false pretense, false promise,
misrepresentation, or the knowing concealment, suppression, or
omission of [a] material fact with intent that others rely upon
such concealment, suppression or omission.'"  Id.  The McDarby
court was not persuaded by the argument that the plaintiffs could
properly assert separate claims under both the PLA and the CFA
where the court found the core issue underlying plaintiffs' claim
was essentially a products liability claim for failure to warn of
potential harm.  Id. at 278.  The Appellate Division concluded
that like the plaintiffs in Lead Paint,[9] the McDarby "plaintiffs'
own arguments make it clear that what they are asserting is, at
its core, that Merck failed to warn of dangers from a product of
which it had knowledge, resulting in alleged economic harm to

_____

9.  As Sinclair was decided six days after the decision in
McDarby, the Appellate Division in McDarby was unable to rely on
Sinclair as precedent at that time.

them." Id. at 278.  The Appellate Division further determined
that the economic harm upon which the McDarby plaintiffs' CFA
claim was based "consist[ed] of a loss 'deriving from' personal
physical illness, injury or death, pain and suffering, mental
anguish or emotional harm, and loss of consortium [which was] ...
encompassed within the definition of harm set forth in the PLA."
Id.

Taking into consideration the remedial nature of the PLA,
the legislative policy seeking to limit the expansion of
products-liability law, and the legislative intent to limit
liability for manufactures in order to balance the interests of
the public and the individual, the Appellate Division in McDarby
recognized that permitting "an expanded form of relief would be
to destroy the balance established between the interests of
manufacturers, the public and individuals established by the
Legislature in enacting the PLA by introducing an otherwise
unavailable treble-damage remedy for harms resulting from a
failure to warn." Id. at 278.  Accordingly, the McDarby court
found that the plaintiffs could not bring a separate cause of
action under the CFA for "the fraudulent withholding of safety
information ... - a cause of action that likely would be
available to most product liability plaintiffs claiming a failure
to warn[,]" because doing so would "permit an award of attorneys
fees in the majority of product liability actions without

Legislative authorization for such relief." Id.

Guided by the decisions in Lead Paint, McDarby, and Sinclair, the Law Division of the New Jersey Superior Court subsequently granted summary judgment in favor of several pharmaceutical company defendants in Bailey v. Wyeth, Inc., 37 A.3d 549, 582-83 (N.J. Super. Ct. Law Div. 2008), aff'd, 28 A.3d 1245 (N.J. Super. Ct. App. Div. 2011), finding that the plaintiffs' CFA claim and claims for fraudulent and negligent misrepresentation were all subsumed by the PLA.  In Bailey, the plaintiffs' claims arose from plaintiff Dora Bailey's breast cancer diagnosis which allegedly resulted from her ingestion of three prescription drugs used in hormone replacement therapy. Id. at 553.  The plaintiffs thus asserted several claims including, but not limited to, violations of the PLA including failure to warn and design defect, fraudulent misrepresentation, negligent misrepresentation, violations of the CFA, negligence, breach of implied warranty, and breach of express warranty.  Id. at 553, 579.

The pharmaceutical defendants moved for summary judgment on the plaintiffs' non-PLA causes of action — negligence, breach of implied warranty, breach of express warranty, fraudulent misrepresentation, negligent misrepresentation, and the CFA claim

17

— arguing that these claims were subsumed by the PLA.[10]  Id. at
579-80.  In opposition to the defendants' subsumption argument,
the plaintiffs argued that the defendants "mislead physicians and
the public about the safety of [the hormone replacement therapy
drugs], and that defendants' fraudulent misrepresentation led
directly to plaintiffs' purchase of those drugs and receipt of
less than what they were promised."  Id. at 580.  The Bailey
plaintiffs further contended that their "purely economic loss
[was] separate and distinct from the damages plaintiffs incurred
as a result of Dora's physical injuries, which ... were caused by
her ingestion of these products."  Id.

     After a thorough review of the decisions issued in Lead
Paint, Sinclair, and McDarby, the Law Division examined the
essential nature of the Bailey plaintiffs' CFA claim.
Ultimately, the court concluded that plaintiffs' CFA claim
"merely charge[d] that defendants misrepresented the safety risks
of their products, thus causing [plaintiff's] injury."  Id. at
582.  Recognizing that "'the PLA is paramount when the underlying
claim is one for harm caused by a product[,]'" the Bailey court
found that the plaintiffs' CFA claim charging misrepresentation
of product safety information leading to injury constituted the
"'classic articulation of tort law duties, that is, to warn of or

_____

10.  The plaintiffs in Bailey voluntarily dismissed their claims
for negligence, breach of implied warranty, and breach of express
warranty.  Id. at 579.

18

make safe," which fell squarely within the theories included in
the PLA.  Id. (citing Sinclair, 948 A.2d at 596; Lead Paint, 924
A.2d at 503).  Accordingly, the Law Division concluded that the
Bailey plaintiffs could not seek damages for the loss of their
co-payments under a CFA theory where the plaintiffs simply
alleged "that they were victims of fraudulent conduct ... because
[the] defendants misrepresented the safety of their products by
failing to warn [the] plaintiffs of their dangers."  Bailey, 37
A.3d at 582.  The court found that allowing such a CFA claim to
proceed would "'create a cause of action entirely inconsistent
with the PLA's comprehensive legislative scheme.'"  Id. (citing
Lead Paint, 924 A.2d at 505).

Similarly, the Law Division went on to explain that the
Bailey plaintiffs' claims for both fraudulent misrepresentation
and negligent misrepresentation were "also subsumed by the PLA
for the same reasons cited" with respect to subsumption of the
CFA claim.  Bailey, 37 A.3d at 582.  The Law Division noted that
"New Jersey state and federal courts have consistently dismissed
product liability claims based on common law theories ... when
those theories allege harm caused by a product[,]" including
common-law claims for strict liability, negligence, implied
breach of warranty, and fraud-based claims.  Id. at 583-84
(citing cases).  After a careful review of the plaintiffs'
complaint, the Law Division in Bailey concluded that "there [was]

19

no doubt [that] plaintiffs' common-law causes of action, including their fraud and misrepresentation ... and negligent misrepresentation claims involve[d] harm caused by a product under the PLA." Id. at 584. Emphasizing that under the PLA New Jersey maintains "'one unified, statutorily defined theory of recovery for harm caused by a product[,]'" the court held that the plaintiffs could not "recast a products liability claim as a fraudulent or negligent misrepresentation claim[,]" and noted that New Jersey courts have consistently affirmed this position. Id. (citing Lead Paint, 924 A.2d at 503.) Accordingly, the plaintiffs' CFA claims and claims for fraudulent and negligent misrepresentation were dismissed as being subsumed by the PLA.[11]

**B. Novartis's Subsumption Argument**

In support of its motion, Novartis cites two cases from the District of New Jersey and two cases from the New Jersey Superior Court, Appellate Division, including McDarby, which found that plaintiffs' common law fraud claims and claims under the CFA were subsumed by the PLA, despite the plaintiffs' attempts to otherwise reclassify the claims. See, e.g., Arlandson v. Hartz Mountain Corp., 792 F. Supp. 2d 691, 702-04 (D.N.J. 2011);

---

11. In a subsequent appeal, the Appellate Division "affirm[ed] substantially on the basis of the well-considered and exhaustive opinion of Judge Happas in the Bailey matter, which [the Appellate Division] determined [was] ... well supported by the evidence and legally unassailable." DeBoard v. Wyeth, Inc., 28 A.3d 1245,1246 (N.J. Super. Ct. App. Div. 2011).

O'Donnell v. Kraft Foods, Inc., No. 09-4448, 2010 WL 1050139, at
*2-3 (D.N.J. Mar. 18, 2010); DeBenedetto v. Denny's, Inc., No. L-
6259-09, 2011 WL 67258, at *2-3 (N.J. Super. Ct. App. Div. Jan.
11, 2011); McDarby v. Merck & Co., 949 A.2d 223, 276-279 (N.J.
Super. Ct. App. Div. 2008).  Novartis analogizes these cases to
the present case and contends that here, "Plaintiffs' fraud-based
claims fall directly within the NJPLA's definition of a product
liability action because such claims are based solely on damages
allegedly sustained to Plaintiffs' blueberry crops from the
application of Novartis' Diazinon AG600 product in combination
with the [fungicides]."  (Novartis Mem. 8.)

     In Novartis' view, Plaintiffs have alleged that Novartis was
aware of the purported hazards in AG600, and misrepresented,
concealed and marketed AG600 with knowledge of these alleged
risks.  (Id.)  Thus, Novartis contends that Plaintiffs' claims
constitute a "classic articulation of tort law duties ... to warn
of or to make safe" and these fraud-based claims therefore fall
squarely within the theories of liability encompassed by the PLA.
(Id. at 8-9.)  Novartis argues that Plaintiffs' fraud-based
claims cannot proceed where the core of Plaintiffs' complaint
alleges damage to crops based on the use of AG600.  (Id. at 9.)
Novartis asserts that allowing such fraud-based claims to proceed
would impermissibly undermine the New Jersey legislature's intent
"'to replace all pre-existing claims by one unified, statutorily

21

defined theory of recovery for harm caused by a product'" because it would introduce an "'otherwise unavailable treble-damage remedy for harms resulting from a failure to warn.'" (Id. at 9) (citing McDarby, 949 A.2d at 277).

**C.  Allegations in Plaintiffs' Fourth Amended Complaint**

In determining whether Plaintiffs' common law misrepresentation claims and statutory claims under the CFA are subsumed by the PLA in this particular case, the Court must evaluate the essential nature of the claims presented and decide whether, at their core, Plaintiffs' claims would traditionally be considered as products liability claims.  In doing so, the Court looks to the allegations set forth in Plaintiffs' fourth amended complaint.

Plaintiffs generally allege in the fourth amended complaint that prior to 1996, Novartis marketed Diazinon (both AG500 and 50 WP), an insecticide used for killing various insects which infect fruit-bearing plants and carry disease, which could be mixed with a fungicide and sprayed on plants to simultaneously protect against fungus and insects without harming the plant.  (Fourth Am. Compl. [Doc. No. 121] Factual Allegations, ¶¶ 1-3.) According to Plaintiffs, in 1997 Novartis began marketing AG600 as a new product formulation of Diazinon, and that the labels on AG600 contained essentially the same product information and warnings as those found on the labels of AG500 and 50 WP.  (Id.

22

¶¶ 3, 5.)  Plaintiffs further allege that on approximately
February 24, 1997, Novartis received approval from the United
States Environmental Protection Agency for a revised AG600 label
which altered the mixture formulation, and that none of the
labels for either AG500, AG600, or 50 WP ever warned against the
spraying of the insecticide together with a fungicide.  (Id. ¶¶
6-7.)

Plaintiffs contend that in the spring of 1997, Plaintiffs
purchased AG600 to use alone or in combination with a fungicide
to control insects and fungus on their blueberry plants, and that
they began treating their blueberry plants in early May of 1997
by spraying either AG600 alone or in combination with a
fungicide.  (Id. ¶¶ 8-9.)  However, by the end of May of 1997,
Plaintiffs allege that they began noticing damage to the
blueberry plants sprayed with either AG600 alone or a mixture of
AG600 and a fungicide.  (Id. ¶ 10.)  Plaintiffs represent that
varieties of blueberry plants known as "Weymouth" and "BlueCrop"
were "[e]specially hard hit" by the damage, but that all the
varieties of blueberry plants which were sprayed with AG600 were
damaged and that this damage was reported to Novartis.  (Id. ¶¶
10-11.)  Plaintiffs specifically allege that other blueberry
plants on their farms which were sprayed with different
pesticides, other than AG600, "exhibited no damage."  (Id. ¶ 10.)

As the 1997 blueberry season continued and the damaged plants began to produce blueberries, Plaintiffs allege that "[c]onsistent fruit injuries were documented shortly after the use of" AG600.  (Id. ¶¶ 12, 14.)  Plaintiffs assert that they observed damage, not just to the plants, but to the blueberries themselves.  Berries harvested that season appeared deformed, shriveled, scarred, and failed to develop their full blue coloration.  (Id. ¶¶ 12, 15.)  By comparison, Plaintiffs allege that the blueberries harvested from plants which were not sprayed with AG600 "retained a typically smooth, waxy, blueish cuticle." (Id. ¶ 16.)  As a result of this damage, Plaintiffs allege that they hired Dr. William Sciarappa, Ph.D. to investigate and document the damage done to both the blueberry crop and the blueberry plants.  (Id. ¶ 13.)  Plaintiffs also represent that Novartis later sent two separate representatives to Plaintiffs' farms to assess the damage done by AG600 and work with Plaintiffs on a resolution.  (Id. ¶¶ 17-18.)

The fourth amended complaint also alleges that the use of AG600 in 1997 resulted in continuing damage in the spring of 1998, and that microscopic inspection of the blueberry plants later revealed "dead and discolored plant tissue within the buds that were expected to develop the fruit and foliage" in 1998. (Id. ¶¶ 27-28.)  According to Plaintiffs, the damage documented in 1998 which resulted from the spraying of AG600 in 1997

24

included the death or severe injury of young plants and replants, a decreased berry yield for medium size plants, a significant decrease in foliage and cane growth, a reduction in the amount of fruit harvested, a reduction in the overall size of the blueberries, and the observance of "twig blight" in these plants which resulted from a pathogen entering the already weakened branches.  (Id. ¶ 29.)

Based on this damage, Plaintiffs assert that Novartis placed AG600 "into the market or stream of commerce knowing that it would not and could not be inspected for defects."  (Id. ¶ 36.) According to Plaintiffs, "[a] farmer applying [AG600] was relying upon the experience and expertise of Novartis when using the product to ensure that it did not have a latent ingredient, contaminant or defect which would cause harm to plants, fruit or land."  (Id.)  As a result, Plaintiffs assert that their "blueberry plants and lands [were] damaged not only for the 1997 crop year, but well into the future."  (Id. ¶ 37.)

Specifically with respect to Count IV for negligent misrepresentation/fraud, Plaintiffs make the following pertinent allegations:

> 3.   Defendant NOVARTIS, represented to its distributors, customers, purchasers and users that DIAZINON AG600 WBC effectively controlled certain insects **without inflicting adverse effects on plants or soil**.

> 4.   Defendant NOVARTIS is liable to Plaintiffs for negligent misrepresentation because NOVARTIS

25

intentionally made statements relative to their product DIAZINON AG600 WBC which were material facts and **NOVARTIS knew or should have known that these statement[s] were false when made.**

5.   Defendant NOVARTIS intended for Plaintiffs to rely upon these statements and to rely upon the written material relative to their product DIAZINON AG600 WBC.

6.   Plaintiffs did, in fact, **rely upon the statements, representations** and written material of NOVARTIS concerning DIAZINON AG600 WBC to their detriment.

7.   Because of the actions of NOVARTIS, plaintiffs have **suffered damages.**

(Fourth Am. Compl. [Doc. No. 121] Count IV, ¶¶ 3-7) (emphasis added).

Plaintiffs allegations in support of Count VII for breach of the CFA state in pertinent part that:

2.   Defendant Novartis ... violated the New Jersey Consumer Fraud Act ... by the misrepresentation or the knowing, concealment, suppression or omission of a material fact to the Plaintiffs with the intent that the Plaintiffs rely upon such concealment suppression or omission in connection with the sale of their product Diazinon AG600WBC to **be used safely** by the Plaintiffs on Blueberry plants as an insecticide.

3.   As a result of Defendant NOVARTIS' violation of the New Jersey Consumer Fraud Act, Plaintiffs have **suffered damages.**  Pursuant to [the CFA], Plaintiffs are entitled to recover treble damages thereon as well as attorney's fees and costs of suit.

(Fourth Am. Compl. [Doc. No. 121] Count VII, ¶¶ 2-3) (emphasis added).

By comparison, Plaintiffs' claim under the PLA alleges the following:

2. Defendant, NOVARTIS, designed, tested, and manufactured [AG600].

3. [AG600] was placed into commerce by NOVARTIS, with NOVARTIS knowing that it would not be inspected for defects nor tested by consumers prior to its application.

4. The NOVARTIS product, [AG600], contained a latent defect undiscoverable by Plaintiffs in the normal course of business or use, which defect **resulted in injury to Plaintiffs' plants or land.**

5. NOVARTIS, by taking reasonable care, either **knew or should have known** at the time it placed [AG600] into the stream of commerce that it contained a latent defect which **could cause harm or injury to Plaintiffs plants and land.**

6. Plaintiffs purchased the **NOVARTIS product, [AG600]** as a finished product which, upon application and use, **injured Plaintiffs' plants and land.**

7. The product [AG600] contained a latent defect at the time it left the processing or manufacturing facility of NOVARTIS which made [AG600] **unreasonably dangerous to the plants and land of Plaintiffs.**

(Fourth Am. Compl. [Doc. No. 121] Count I, ¶¶ 2-7) (emphasis added).

### D.  **Essential Nature of Plaintiffs' Claims**

Set forth above are approximately twenty-two factual paragraphs alleged by Plaintiffs in the fourth amended complaint. Of these twenty-two paragraphs, approximately thirteen

specifically refer to the damage (or the "injuries") to blueberry plants or fruit caused by spraying AG600. (Fourth Am. Compl. [Doc. No. 121] Factual Allegations, ¶¶ 10-15, 17-18, 27-29, 36-37.) Within these paragraphs, Plaintiffs use the words "damage", "damages", "damaged", "injuries", or variations thereof, approximately twelve separate times when describing the factual basis underlying Plaintiffs' case. (Id. ¶¶ 10-14, 17-18, 27, 29.) Six of these factual paragraphs go on to explain in greater detail the type of damage and plant injury which resulted from the use of AG600 as compared to blueberry plants which were not sprayed with AG600. (See, e.g., id. ¶¶ 10, 12, 15-16, 28-29.) For example, Plaintiffs allege that the Weymouth and BlueCrop plant varieties treated with AG600 in 1997 were damaged most severely and that the damage to all the varieties went beyond the plants themselves but also affected the fruit, resulting in deformed, shriveled, scarred, and off color blueberries, compared to berries from plants that were not sprayed with AG600. (Id. ¶¶ 10, 12, 15-16.)

Plaintiffs also alleged continuing damage to the plants, specifically that microscopic inspection revealed dead and discolored plant tissue which affected development of fruit and foliage in 1998 resulting from spraying AG600 in 1997 (Id. ¶ 28.) Significantly, Plaintiffs alleged that the "[d]ocumented damage during the [1998] crop year ... attributable to the spraying of

[AG600] in the spring of 1997 included, ... young plants and replants dying or sustaining severe injury; medium size plants yielding less berries; new foliage and cane growth significantly decreased; less fruit to harvest; the berries were smaller in size and the plants were suffering from "twig blight[.]"  (Id. ¶ 29.)

Upon a careful reading of Plaintiffs' fourth amended complaint as detailed above, the Court agrees with Novartis that the essential nature of Plaintiffs' case is in fact that of a traditional product liability action and therefore, Plaintiffs' common law misrepresentation claim and statutory claim under the CFA are subsumed by the PLA in this instance.  In light of the allegations in the fourth amended complaint, the Court finds that Plaintiffs' case is – at its core – centered directly on the extent of the damage that resulted to the blueberry plants and fruit after Plaintiffs' use of AG600 in 1997.  While Plaintiffs also clearly allege that Novartis misrepresented that AG600 controlled certain insects without inflicting adverse effects on plants or soil and that Plaintiffs relied on these misrepresentations in purchasing and using AG600 to treat their blueberry plants, the heart of Plaintiffs' dissatisfaction is that the product itself, AG600, caused harm to the blueberry plants.  Harm which Plaintiffs contend could have been prevented because Novartis knew (or should have known) that AG600 would

adversely affect their blueberry plants, but fraudulently
withheld this safety information resulting in the alleged damage.

Even accepting as true Plaintiffs' allegation that Novartis
made such misrepresentations or knowingly concealed, suppressed
or omitted a material fact regarding AG600 and its safety as an
insecticide, that alleged conduct is not Plaintiffs' primary
concern.  Plaintiffs' primary concern and the gravamen of their
complaint, as evidenced repeatedly by the allegations detailed
above, is that the application and use of Novartis' insecticide
product – AG600 – to treat Plaintiffs' blueberry plants resulted
in harm to the plants and the fruit yields, and that Novartis
failed to inform Plaintiffs of this potential for harm.

Here, just as in Lead Paint, McDarby, and Bailey,
Plaintiffs' fraud-based claims essentially allege that Novartis
was aware of the dangers and potential for harm associated with
the use of AG600 and failed to truthfully disclose that
information, *i.e.*, essentially Novartis failed to warn of the
dangers to plants associated with AG600's use.  This is a clear
articulation of the classic tort law duty to warn of or make
safe, and thus Plaintiffs' fraud-based claims are merely a
recasting of their PLA claims in this particular case.  See,
e.g., Lead Paint, 924 A.2d at 503-04; Bailey, 37 A.3d at 582-84.
Because the PLA is paramount and its broad scope encompasses
virtually all possible causes of action for harm caused by a

product, irrespective of the theory underlying the claim, Plaintiffs' fraud-based claims in this case are subsumed by the PLA and must be dismissed.

In an attempt to avoid the inescapable conclusion that the core issue in this case centers directly on the harm caused to blueberry plants after the use of AG600, Plaintiffs offer several arguments for the Court's consideration, some of which are set forth in detail below.  However, the Court finds as a general matter that none of Plaintiffs' proffered arguments are sufficient to defeat Novartis's contention, and this Court's determination, that the core issue underlying Plaintiffs' claims brings this action within the purview of the PLA and that any potential fraud-based claims are subsumed by that statute.[12]

---

12.  At the outset, the Court rejects Plaintiffs' contention that their CFA claim "should be submitted to the jury as directed by the Third Circuit which [previously] held that the Plaintiffs have demonstrate a *prima facie* case for consumer fraud."  (Pls.' Opp'n 15) (citing Indian Brand Farms, Inc. v. Novartis Crop Protection Inc., 617 F.3d 207 (3d Cir. 2010)); (see also Pls.' Opp'n 18) ("[I]t is noteworthy that the 3rd Circuit Court reviewed and considered both the PLA cause and the CFA separately and held that each cause had been show prima facie").
    At the time the Third Circuit issued its opinion in 2010, the issue of whether or not Plaintiffs' fraud-based claims were subsumed by the PLA had not yet been briefed or argued before the District Court, and the Third Circuit was not presented with the opportunity to consider this issue.  However, at this stage of the case, the issue has now been fully briefed and argued before this Court, and the Court may properly issue a ruling regarding this distinct legal issue of subsumption under the PLA at this time.  It is not unusual, or particularly telling, that the Court of Appeals would have assumed that both claims remained in the case since they remained in the case at the time of the appeal. What would have been unusual would have been the Court of Appeals

Initially, Plaintiffs argue that their claims under the PLA and
the CFA are "only peripherally connected" and that the CFA is "an
obviously severable claim capable of being tried on the
discovered facts relevant to its proofs, which facts are
completely different than those ... relevant to proving
Plaintiffs' PLA claim." (Pls.' Opp'n to Def.'s Rule 12(c) Mot.
for J. on the Pleadings as to Pls.' Fraud-Based Claims [Doc. No.
289] (hereinafter, "Pls.' Opp'n"), 1.)

Plaintiffs devote a substantial portion of their brief to
arguing that under federal law there are clear distinctions
between state product liability claims based on a failure to warn
and state consumer fraud claims. (Id. at 4.) According to
Plaintiffs, federal law "distinguishes failure to warn claims and
CFA claims [by] setting out the differing standard[s] to be met
and the differing duties imposed." (Id. at 5.) Applying this
reasoning to the New Jersey CFA and PLA, Plaintiffs argue that
"under the NJ CFA, the predicate [of the claim] is based not on a
duty to manufacture a safe pesticide but rather a duty not to
deceive or make false statements of material fact such as claims
of safety in marketing materials." (Id. at 6.) Throughout their
opposition, Plaintiffs repeatedly contend that the facts and
circumstances which underlie the proofs for the fraud-based

---

addressing an issue not briefed before that Court or ruled on
below.

claims are fundamentally different from those underlying a claim
for failure to warn against the dangers of a product.

While Plaintiffs continually emphasize for the Court that
New Jersey law provides two separate and distinct causes of
action under two separate statutes – the CFA and the PLA,
Plaintiffs' argument does little to persuade the Court that
Plaintiffs' fraud-based claims are not subsumed by PLA in this
particular case.  The Court readily acknowledges the fundamental
principal that, as set forth by statute in the state of New
Jersey, independent causes of action exist for consumer fraud
under the CFA and products liability under the PLA — each with
its own respective set of required elements and necessary proofs.
However, that issue is not disputed with respect to the present
motion.  Despite Plaintiffs' interpretation, Novartis's motion
does not seek to upend the statutory scheme implemented by the
New Jersey Legislature in such a way as to eradicate a cause of
action for consumer fraud in its entirety.  Rather, Novartis's
motion is a more nuanced one.

Here, Novartis requests that this Court apply controlling,
instructive, and persuasive case law from New Jersey state and
federal courts which demonstrate that given its expansive and
inclusive scope, the PLA is paramount over other legislation,
encompasses virtually all possible causes of action relating to
harms caused by a product, and takes precedence over claims pled

under the CFA in cases where the core issue is harm caused by a product.  Significantly, Plaintiffs actually concede the basic premise underlying Novartis's motion — "that when a consumer fraud claim is based on facts which support a failure to warn claim, the case is subsumed by the PLA[.]"[13]  (Pls.'s Opp'n 9.)

Plaintiffs, however, attempt to distinguish their CFA claim from their PLA claim by arguing that their "CFA action is based on misrepresentations made by [Novartis] in an advertising brochure which stated ... that AG600 was safer and more effective than its previous product[.]"  (Pls.' Opp'n 3.)  Plaintiffs repeatedly assert that these alleged misrepresentations about the safety of AG600 are sufficient to allow both the CFA and the PLA claims to proceed independently in this case.  (See generally Pls.' Opp'n 7-10, 14-15); (see, e.g., id. at 10) ("Plaintiffs' claims for CFA are not failure to warn claims couched as CFA claims.  They are CFA claims based on misrepresentation by [Novartis] in a brochure stating that the product is safer.");  (id. at 15) ("Plaintiffs claims are not failure to warn claims dressed as consumer fraud claims wherein the Plaintiffs are attempting to get another remedy for the same damage, but are based on a misrepresentation in an advertising brochure wherein

---

13.  Despite conceding this basic premise, Plaintiffs continue to argue that their particular CFA claim is different than those in other cases and does not amount to a failure to warn claim under the PLA, thus it cannot be subsumed.

the Defendant claimed ... that the product was safer for blueberries.")

Plaintiffs' narrow focus on the alleged misrepresentations as the key distinction between the two claims essentially amounts to a distinction without a difference under the controlling and instructive case law on this issue.  For example, the Appellate Division in McDarby determined that the plaintiffs' CFA claim was subsumed by the PLA and in doing so, reversed a jury verdict which expressly found that "Merck ... made misrepresentations that had the capacity to mislead concerning the cardiovascular risk of Vioxx while marketing the drug to prescribing physicians, and that Merck ... intentionally suppressed, concealed, or omitted material information about an association between Vioxx and an increased risk of cardiovascular events from prescribing physicians."  949 A.2d at 276 n.49.  Similarly, the Law Division in Bailey also expressly rejected this argument and found that the plaintiffs' CFA claim, as well as their fraudulent and negligent misrepresentation claims, were subsumed by the PLA despite allegations that "defendants mislead physicians and the public about the safety of [the hormone replacement therapy drugs], and that defendants' fraudulent misrepresentation lead directly to plaintiffs' purchase of those drugs[.]"  37 A.3d at 579-580, 583-84.  Therefore, even assuming the truth of Plaintiffs' allegations, the notion that these misrepresentations

35

alone are sufficient to prevent a CFA claim or a common law misrepresentation claim from being subsumed under the PLA has been repeatedly rejected, and Plaintiffs' argument here must fail.[14]

Moreover, Plaintiffs' reliance on several cases from New Jersey state and federal courts is misplaced.  For example, Plaintiffs cite to <u>Lee v. Carter-Reed Co.</u>, 4 A.3d 561 (N.J. 2010)

---

14.  Plaintiffs make a protracted argument about the timing of the alleged misrepresentations contending that:

> It should also be noted that the harm was caused by spraying of the blueberries with Diazinon/Captan which would never have happened if the farmers did not purchase Diazinon, which would never have happened if Rutgers did not instruct the farmers to buy Diazinon, quoting from the Diazinon brochure that it was safer than the old Diazinon, which would never had happened if Novartis had not published false claims in its brochure and sent them to and discussed them with the Professors at Rutgers Agricultural Extension knowing they would use it to influence the farmers to buy the product. Sequentially then, the initial cause of the harm and farmers' loss of profits was the CFA violation which preceded in time the occurrence of the PLA violation.

(Pls.' Opp'n 21.)

Even accepting the premise of this argument as true — that the CFA violation preceded in time the PLA violation — the timing of the alleged violations is not determinative of the issue of subsumption.  The critical issue with respect to Novartis' motion is the essential nature of Plaintiffs' claims and whether that core issue is harm caused by a product.  The alleged timing of the violations sheds no light on whether Plaintiffs are asserting claims based on harm from a product.  Thus, this argument is insufficient to persuade the Court that Plaintiffs' CFA claim is not subsumed by their PLA claim.

to support the proposition that "cases involving misrepresentation[s] made relating to products have been permitted to go forward without even an issue as to whether or not the PLA subsumes the claim." (Pls.' Opp'n 9.)  According to Plaintiffs, the holding in Lee "undermines [Novartis's] argument that all cases relating to harm caused b the product are subsumed by the PLA." (Id.)  Despite Plaintiffs' arguments, the Court finds that Lee is neither controlling nor persuasive authority with respect to the issue of subsumption under the PLA.

As Plaintiffs concede, Lee did not deal with any issues or claims arising under the PLA. (Id.)  As the New Jersey Supreme Court explained, the plaintiff in Lee "filed a class-action lawsuit on behalf of thousands of New Jersey consumers, alleging that Carter Reed sold [the dietary supplement] Relacore using various mass-marketing deceptions that violated the New Jersey Consumer Fraud Act, breached express and implied warranties, and unjustly enriched Carter Reed." 4 A.3d at 566.  While the alleged misrepresentations by Carter-Reed were the key aspects of the plaintiff's class action complaint for consumer fraud in Lee, the plaintiff made absolutely no claims that the dietary supplement at issue caused any sort of harm falling within the purview of the PLA.  Instead, the plaintiff in Lee only alleged that Carter-Reed falsely represented that Relacore would reduce belly-fat, and then brought her claims under the CFA when the

supplement did not deliver on its advertised claims.  Id. at 567.
Since Lee does not address the issue of subsumption under the
PLA, the relevant inquiry on the present motion, it is of little
help here.

Plaintiffs also rely heavily on Wendling v. Pfizer, Inc.,
2008 WL 833549 (N.J. Super. Ct. App. Div. Mar. 31, 2008), and
essentially argue that Wendling demonstrates that "[i]f the
plaintiffs ... allege that there was a misleading and false or
materially deficient product advertisement, the CFA and the
negligent misrepresentation claims must stand." (Pls.' Opp'n
14.)  Plaintiffs place particular emphasis on the Appellate
Division's determination in Wendling that plaintiffs' negligent
misrepresentation claim was not subsumed by the PLA because "it
was not the product itself that caused the harm, but allegedly
its misleading promotion." (Id.) (citing Wendling, 2008 WL
833549, at *8).  While Plaintiffs accurately quote from the
Appellate Division's opinion in Wendling, Plaintiffs fail to
consider several key distinctions between Wendling and the
present case.  As a threshold matter, the plaintiffs in Wendling
did not allege an independent PLA claim based on a failure to
warn of the potential for harm by a veterinary product.
Wendling, 2008 WL 833549, at *1 (noting that plaintiffs brought
claims for common law negligent misrepresentation and violations
of the CFA).

38

Rather than asserting a PLA claim, the plaintiffs in
Wendling "essentially allege[d] that the advertisement for
defendant's veterinary product, Strongid C, was false and
misleading because it stated that it would 'prevent and control
parasites every day,' but it did not prevent or control
tapeworms, a type of parasite, that infested and eventually
killed [the plaintiffs'] horse."  Id.  In upholding the trial
court's dismissal of the plaintiffs' CFA and negligent
misrepresentation claims, the Appellate Division noted that the
label for the veterinary product at issue (Strongid C)
specifically listed four types of parasites the drug would treat,
and the court highlighted the fact that tapeworms were not among
the parasites listed.  Id. at *2.  The Appellate Division went on
to conclude that the "pluralizing of [the word] 'parasite' in the
advertisement [did] not reasonably imply a universal and complete
antidote that treat[ed] effectively all types and species of
parasites."  Id. at *4.  Thus, the Wendling court held that the
advertisement was neither false nor misleading under the CFA,
that the statement in the advertisement was not actionable, and
that the plaintiffs' CFA claim was properly dismissed.  Id. at
*4-5.

In addressing the defendant's cross-appeal regarding

subsumption under the PLA,[15] the Appellate Division rejected the defendant's argument that "plaintiffs' CFA claim [was] barred by the PLA because it [was] essentially a failure to warn claim[.]" Id. at *7.  Unlike Plaintiffs in this case, the court specifically noted that the Wendling plaintiffs did not allege a product defect or that Strongid C was not reasonably fit for its intended use because of inadequate warnings.  Id. at *8.  The Appellate Division considered the nature of the Wendling plaintiffs' claims and recognized that those plaintiffs did not allege that the defendants' veterinary product caused the death of the horse.  Rather, the facts in Wendling demonstrated that the plaintiffs used the defendant's veterinary product to prevent parasites from harming their horse.  The product at issue was designed for the treatment of four specific types of parasites. Subsequently, the horse contracted an independent infestation of tapeworms, a type of parasite defendant's product was not designed to prevent or treat.  The horse ultimately died as a result of the tapeworm infestation.  Thus, the Wendling plaintiffs did not claim that the use of the defendant's product resulted in harm to their horse.  It was an independent, intervening source (i.e., the tapeworms) that caused harm in that

---

15.  The Appellate Division noted that the defendant's cross-appeal was moot in light of propriety of the summary judgment dismissal, but addressed the subsumption issue anyway "because it str[uck] a recurrent note[.]"  Wendling, 2008 WL 833549, at *6.

case.

By comparison, the factual allegations in Plaintiffs' fourth amended complaint completely belie any attempt by Plaintiffs to argue that their case does not assert that the product itself – AG600 - caused harm to their blueberry plants.  As detailed at length supra, Plaintiffs repeatedly allege that the spraying of AG600 ultimately resulted in harm to the blueberry plants, including but not limited to plant death and reduced fruit yields.  Unlike the horse in Wendling which was ultimately harmed when it contracted an independent tapeworm infestation, separate and apart from the use of the veterinary product at issue, in the present case, Plaintiffs specifically contend that the use of Novartis' AG600 product directly resulted in harm to the blueberry plants.  There was no independent cause of the harm, and thus Wendling is distinguishable from the present case and Plaintiffs' reliance upon it is misplaced.  While the Appellate Division's statement that "it was not the product itself that caused the harm, but allegedly its misleading promotion" may have appeared at first blush to support Plaintiffs' argument, a closer examination of this statement in the context of Wendling's facts and circumstances reveals that this phrase is insufficient in this case to demonstrate that Plaintiffs' fraud-based claims are not subsumed by the PLA.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Novartis' motion [Doc. No. 286] for judgment on the pleadings with respect to Plaintiffs' fraud-based claims is granted.  Accordingly, Counts IV and VII of Plaintiffs' fourth amended complaint alleging (1) common law claims for negligent misrepresentation/fraud; and (2) statutory claims for violations of the New Jersey Consumer Fraud Act are dismissed with prejudice.  In light of the Court's finding that Plaintiffs' claims under the Consumer Fraud Act are subsumed by the New Jersey Products Liability Act and must be dismissed, Plaintiffs' motion in limine [Doc. No. 216] seeking an order entering partial summary judgment on the issue of causal connection under the CFA is now moot.  An Order consistent with this Opinion will be entered.


Dated: August 27, 2012          /s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

42